No. 16,709.

PEOPLE EX REL. PUBLIC UTILITIES COMMISSION ET AL.
*v.* MOUNTAIN STATES TELEPHONE
AND TELEGRAPH COMPANY
ET AL.

No. 16,711.

MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY
*v.* CITY AND COUNTY OF DENVER
ET AL.
(243 P. [2d] 397)

Decided February 11, 1952.   Rehearing denied April 7, 1952.

Mr. DUKE W. DUNBAR, Attorney General, Mr. H. LAW-RENCE HINKLEY, Deputy, Mr. RALPH SARGENT, JR., Assistant, for the Public Utilities Commission.

Messrs. AKOLT, CAMPBELL, TURNQUIST & SHEPHERD, for Mountain States Telephone and Telegraph Company.

Mr. LEONARD M. CAMPBELL, Mr. LELAND E. MODESITT, for City and County of Denver et al.

Messrs. GELT & GROSSMAN, Mr. ALBERT T. FRANTZ, Mr. ABE L. HOFFMAN, for defendant in error Sarpy.

Mr. ROBERT H. DARDEN, for defendant in error Levstik.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the court.

BY order of this court, causes No. 16709 and No. 16711, pending here on writ of error, were consolidated and one set of briefs captioned in both cases was authorized, such briefs to be considered as filed in both proceedings.

The said cases in the trial court involved identical questions and our considered opinion concerning controlling questions makes it unnecessary to incorporate in this opinion all the contentions of the parties as to the law which should be applied to facts concerning which there is no material conflict. We will herein refer to the City and County of Denver as City, and the Mountain States Telephone and Telegraph Company will be designated as the Telephone Company.

In the year 1919 this court handed down its decision in the case of the *City and County of Denver v. Mountain States Telephone and Telegraph Co.*, 67 Colo. 225, 184 Pac. 604, in which by a four to three decision it was held that the telephone service being rendered by the company in the City and County of Denver, and the rates to be charged therefor, were matters "local and municipal" to the City, and that said service and rates were proper subjects for exercise of the regulatory powers of the City granted in section 6, Article XX of the Colorado Constitution, which authorizes a home rule city to adopt a charter, "which shall be its organic law and extend to all its local and municipal matters."

Thereafter, and in 1921, the City adopted an ordinance purporting to regulate the telephone rates and service within its boundaries, and telephone service was supplied thereunder without change until 1947. In that year the Telephone Company offered a new service rendered on a uniform basis known as the Denver Metropolitan Exchange Service, covering the metropolitan area, which disregarded the municipal corporate limits of the City and extended to the fringe area surrounding the city limits and the incorporated areas and communities constituting what might be termed the Denver metropolitan area. This new service offering, and the rates to be charged for the same, were approved and concurred in by the mayor, city attorney, and city council of the City by ordinance No. 140 series of 1947 initiated by that council. The rates for the new service were filed with

the Public Utilities Commission and approved by it, and the service and rates were placed in effect in October, 1947.

Thereafter, Mel E. Sarpy and Eugene Frantz filed an action against the Telephone Company in the district court of Denver, challenging the rates being charged for the above mentioned service and asking that the Telephone Company be enjoined from collecting said rates. This action is denominated Sarpy, et al. vs. The Mountain States Telephone and Telegraph Company, Civil Action 59450, Division 5, and is now pending before the district court in the City and County of Denver.

On November 22, 1949, the Public Utilities Commission of the State of Colorado, and the individual members thereof, filed a complaint for declaratory judgment naming as defendants the Telephone Company, the City, the Denver City Council, the said Sarpy, and others identified with the controversy as representatives of a class of persons having an interest therein. Counsel for the Commission in said action for declaratory judgment contend, generally, that the Public Utilities Commission of the State of Colorado now has, and, since at least October 1947, has had, jurisdiction over the metropolitan telephone exchange service and the Telephone Company in the Denver metropolitan area, including the service rendered within the city limits, and over the rates to be charged therefor. This action was considered by the same Judge before whom the *Sarpy* case is now pending and upon motion of all parties for summary judgment the trial court dismissed the complaint of the Public Utilities Commission and, by judgment duly entered, sustained the position contended for by the City and County of Denver and by Sarpy's counsel, the effect of which was to reinstate the rates and regulations governing telephone service within the City as provided by the ordinance of 1921. This action is No. 16709 in this court.

The Telephone Company sued out a separate writ of error seeking review of the same judgment. This action

is No. 16711 in this court. Thus the Public Utilities Commission, in Action No. 16709, and the Telephone Company, in Action No. 16711, seek reversal of the judgment of the trial court as above indicated.

The ultimate question for determination in this case is whether the Public Utilities Commission of the State of Colorado is the agency authorized to regulate the charges of the Telephone Company for the telephone exchange service furnished within the limits of the City. Counsel for the City and Sarpy contend, upon the authority of *Denver v. Telegraph Company, supra,* that the power to regulate the rates of the Telephone Company lies in the municipality, and under our holding in the recent case of *Berman v. Denver,* 120 Colo. 218, 209 P. (2d) 754, the exclusive method provided by law for the exercise of said regulatory power is by the initiation of an ordinance by the people of the City and County of Denver. If the early case of *Denver v. Telegraph Company, supra,* is to be followed under the rule of stare decisis, and if the rule announced in *Berman v. Denver, supra,* be then applied, these conclusions would seem to be well justified. *Denver v. Telegraph Company, supra,* was decided by a four to three vote of the justices, and lengthy opinions appear in the report of the case which contains three concurring opinions expressing agreement in the opinion written by Mr. Justice White, and giving that opinion effect ten months after his term expired as a justice of this court. Three logical and well reasoned dissenting opinions also are included in the report of the case. Unquestionably the issues there determined were decided by a very narrow preponderance of opinion. It is equally certain that the majority opinion was clearly out of harmony with the very great weight of authority as evidenced by the numerous cases decided by appellate courts throughout the country prior to that time. The case of *Berman v. Denver, supra,* likewise was decided by a divided court with two judges not participating.

Under the view we take of the instant case, it is un-

necessary for us to reconsider our opinion in the Berman case. We are not called upon either to be governed by it or to overrule it. Although we now hold that the intra-city business conducted by the Telephone Company is not a matter of local and municipal concern to the City and County of Denver, or any other home rule city, it does not necessarily follow that the services of all public utilities, functioning in whole or in substantial part within a municipality, must thus be classified. Whether a particular business activity is a matter of municipal concern to a city depends upon the inherent nature of that activity and the impact and effect which it may or may not have upon the areas outside the municipality. It cannot properly be said that all services supplied by any public utility company within a municipality are matters of local or municipal concern to the municipality without reference to the kind of service offered, the nature and extent of the physical properties involved, or the demand for, and use of, the services in areas outside the city.

It is ably argued by counsel for the Public Utilities Commission and the Telephone Company that our 1919 decision, in which we held that the service rendered by the Telephone Company within the corporate limits of Denver was a matter of local and municipal concern, is no longer controlling, because of the subsequent growth of the business, the numerous changes in techniques involved, and the difference in the type of service now being offered. In effect, it is argued that the march of progress in the telephone industry has changed that which was "local and municipal" in 1919, to a matter of importance and general public interest to the inhabitants of the state as a whole. We cannot, however, follow the suggestion that these changes and improvements offer an opportunity to declare a distinction of substance, because we are convinced that they have only extended in degree that which was clearly present at

the time of our decision in *Denver v. Telegraph Company, supra.*

If we are to be governed by the rule of stare decisis and follow this early decision, then without question the Public Utilities Commission is without jurisdiction to regulate the business and rates for telephone service within the City and County of Denver. Accordingly we re-examine our opinion in *Denver v. Telegraph Company, supra.*

### Question to be Determined.

*Shall we now hold that the lawful regulation of the business and rates of the Telephone Company within the limits of the City and County of Denver is a matter of general concern to inhabitants of the state outside, as well as inside, the city limits, and that such business, and the regulation thereof, is not purely a "local or municipal" · matter, notwithstanding the 1919 decision of this court to the contrary?*

We answer this question in the affirmative. The rule of stare decisis, although highly beneficial in its place, does not justify or demand the continuance of an erroneous conclusion when error is manifest, where injustice, chaos and confusion result, and where no vested property rights have arisen in reliance upon the erroneous decision. It is universally recognized that, notwithstanding the rule of stare decisis and the inclination to follow precedent, the courts of last resort have the power, and it sometimes is their duty, in serving the interests of justice, to depart from rules previously established by court decision. This especially is true where to adhere to the rule and blindly follow precedent would be more harmful to the public at large than to correct a manifest error and establish a sound principle.

In *People ex rel. v. Cassiday*, 50 Colo. 503, 117 Pac. 357, in discussing the rule of stare decisis we said: "We are not unmindful of the importance of this valuable and salutary principle, recognized in every land whose

jurisprudence, like our own, rests largely upon precedent. Generally courts will adhere to a former decision, though found to be erroneous, where acquiesced in for a long time, and especially if it has become a rule of property. However, where vital public rights are involved, and a decision regarding them is to have a direct and permanent influence, it becomes not only the right, but the duty of a court to fully and carefully reconsider those questions, and permit no previous error to continue if it can be corrected. The rule of *stare decisis* rests upon the ground of public policy, and manifestly it would be grievous error to apply it where such application would result in more harm than good. While no mere doubt in the mind of the court, as to the soundness of a previous rule, will either require or permit of its review, it is equally clear that, if such decision is radically unsound, and serves no useful or wholesome purpose, but results only in great and needless hardship, not contemplated by law, and where no serious results are likely to follow its reversal, then the rule of *stare decisis* does not, and should not be permitted to, interfere to prevent a reconsideration of the principle involved, or with a reversal of a doctrine formerly announced. Of the power of this court to overrule a previous decision, and of its right and duty to do so on proper occasion, there is no question."

In *Wolf v. People*, 117 Colo. 279, 187 P. (2d) 926, Mr. Chief Justice Burke, in writing the opinion of the court, said with relation to the rule of stare decisis: "We are not unconscious of the fact that that rule is frequently ignored with the general approval of the courts, for certain definite and often valid reasons. Among these are doubtful decisions handed down by closely divided courts and recent decisions establishing rules not yet firmly embedded in the jurisprudence of the jurisdiction." In the instant case our former opinion, which forms the basis of the trial court's judgment, is admittedly "doubtful" and "handed down by a closely divided"

court. Mr. Justice Burke, who then was just entering upon his long and distinguished career as a member of this court, freely expressed the then existing doubts in his concurring opinion in the early telephone case.

Other cases, in which the powers and duties of the court with relation to the rule of stare decisis are discussed, are: *Imperial Securities Company v. Morris,* 57 Colo. 194, 141 Pac. 1160; *People ex rel. v. Le Fevre,* 21 Colo. 218, 241, 40 Pac. 882. We recently declined to follow the rule of stare decisis and expressly overruled an earlier decision in the case of *Urbancich v. Mayberry,* 124 Colo. 311, 236 P. (2d) 535. Finally, upon this question, we believe that the instant case comes squarely within the language of this court's opinion in the case of *Calhoun Gold Mining Co. v. Ajax Gold Mining Co.,* 27 Colo. 1, 59 Pac. 607, wherein we said: "We understand, generally, that when a decision has established a settled rule of property, upon which rights are predicated (and especially those relating to real estate), the law will be adhered to by the court announcing it, and those bound to follow its adjudications, even if erroneous (Black on Interpretation of Laws §152), but this rule is not inflexible. Courts are not bound to perpetuate errors merely upon the ground that a previous erroneous decision has been rendered on a given question. If it is wrong, it should not be continued, unless it has been so long the rule of action, and relied upon to such an extent, that greater injustice and injury will result by a reversal, though wrong, than to observe and follow it."

■ First and foremost we expressly overrule our decision in *Denver v. Telegraph Co., supra,* because at the time it was decided the rule announced was without adequate support in the law. The concurring opinion of Mr. Justice Burke includes the following statement: "I think it can not be denied that the question, upon reason, is a close one, *nor that the great weight of authority,* exclusive of the Home Telephone case [211 U.S. 265], is to the contrary." (Italics supplied.)

In the Home Telephone case referred to by Judge Burke, the telephone company operating in Los Angeles, California, brought the action and expressly alleged that the city council of Los Angeles had the power to regulate telephone service and the use of telephones within the city, and to fix and determine charges for that service. That there was in fact no disagreement as to whether the city in that case had the power of regulation is further emphasized in the court's opinion by the following language: "It was decided by the judge of the court below, and *is agreed by the parties,* that this section of the charter *conferred upon the city council,* in conformity with the constitution and laws of the State of California, the power to prescribe charges for telephone service." (Italics supplied.) Thus it is clear that in that case there was no issue or contest as to whether the City of Los Angeles had the power to regulate the utility. That power was admitted. The real issue in the case was whether the city, having exercised its admitted power by establishing rates in a franchise, could, during the term of that franchise, change those rates.

No good purpose would be served by including in this opinion the numerous authorities from the various states which hold that telephone service has come to be generally recognized as not being local or municipal to any particular city or town; and that the only effective and logical regulation to which major telephone companies should be subjected is regulation upon a state-wide basis. The weight of authority to this effect is overwhelming.

In the State of Colorado there are now fourteen home rule cities operating as such under Article XX of the Constitution of Colorado. To uphold the contention of counsel for the City, and Sarpy, in effect, would be to determine that each of these cities, in regulating telephone rates within their limits, should analyze and determine the property, revenues and expenses of the telephone company involved in the furnishing of tele-

phone service in such city; that, by the exercise of some mysterious magic, they should segregate these from the properties, revenues and expenses of the company not directly involved in furnishing service to the city in question; and arrive at a rate which would yield a fair return to the company on that portion of the property involved in providing such local service, and insure adequate protection to the consuming public. To assume that such a task can be accomplished effectively and efficiently, or at all, is manifestly absurd and ridiculous. In determining whether confiscation was brought about by any rate which might be established by any one of the fifteen separate regulating agencies which would thus be operating upon the business of the telephone company at the same time, a court would of necessity be required to go beyond city boundaries and inquire into the property, revenues and expenses of such utility on a statewide basis in order to do justice.

■ While the authority of the state to regulate the telephone company is unquestioned, such regulation must be reasonable and it seems to us grossly unreasonable to subject a telephone company to separate regulation by as many agencies as there are home rule cities operating in the state, and in addition thereto to provide regulation outside home rule cities by the Public Utilities Commission. As so aptly stated by Mr. Justice Scott in one of the three dissenting opinions in *Denver v. Telegraph Company, supra:*

"The contention that each city operating under the amendment may regulate public utilities operating within its borders, must apply to all alike. It follows that if it applies to telephones, it likewise applies to railroads. In case of these utilities one company may operate in all municipalities and throughout the state.

"It also follows that the one utility may be regulated by as many powers as there are cities of the specified class within the state, and by the commission as to all territory outside the cities. Each city may fix a different

rate; the commission may fix a different rate from either city, for the same utility and for like service.

"Can it be denied that such a scheme would not infringe the equal rights of citizens of the state, or the well being of the state. It would not only permit the corporation to do this, but would compel them to do so, regardless of the necessary discrimination between citizens of the state as to rates to be charged and regulations to be observed. It would require the deficiency of income from one city to be supplied by overcharge in other cities, or by the body of the state, outside the cities; for the constitution as construed by the courts, guarantees the reasonable expense of operation, and a reasonable return on the investment in public utilities in the matter of fixing the rates to be charged. The logical result of such a plan, is confusion, chaos and injustice."

We are convinced that a proper protection of the interests of all the interested parties, including the general public, requires that our former decision be overruled.

Accordingly we now hold that the Public Utilities Commission of the State of Colorado is the sole agency authorized to regulate the business and rates of the Mountain States Telephone and Telegraph Company within the State of Colorado; that the regulation of the business of said company and the rates to be charged for service is not a "local or municipal" matter; and that municipalities operating as Home Rule Cities have no power, authority or jurisdiction to attempt such regulation.

The judgments are reversed and the causes remanded for entry of judgments consistent with the views herein expressed.

MR. JUSTICE HOLLAND dissents.

MR. JUSTICE HOLLAND dissenting.

Is the majority opinion herein a defiance of the expressed will of the people, the sovereign power of the

state, and does it, by not adhering to the stabilizing rule of stare decisis, strike down many former decisions of the court and the interests affected thereby? My chief concern, and alarm, is the effect upon home-rule cities and last, but not least, the tendency to discredit and unstabilize the law and the weakening effect of the decisions of this court. I realize the futility of a lengthy discussion of the various aspects occasioned by the opinion; however, the compelling influence of my conscience regarding my duty, as I perceive it, to the people and to this court directs otherwise.

The real target in this case is the decision in *City and County of Denver v. Mountain States Tel. & Tel. Co.*, 67 Colo. 225, 184 Pac. 604, to which I shall herein refer as the "old telephone case." Briefly stated, and without extended discussion, that decision in 1919 determined that the power of the regulation of telephone rates in the City and County of Denver was a local and municipal matter, which was capable of being delegated, and was delegated to Denver in express terms by the people in the Twentieth Amendment to the State Constitution. This court has for thirty-three years consistently adhered to that decision in at least a dozen cases, and it is taken out of the class of "recent, doubtful decisions." I do not always feel impelled to sacrifice my reasoning or idea of justice upon the altar of precedent, and when a case comes clearly within the accepted reasons for the rule, as being a precedent of long standing I yield to the rule. In the present opinion, the reasons stated for not being bound by the rule of stare decisis, come from the rule of stare decisis itself. All of the cases relied upon in the majority opinion are considered settled precedent; therefore, stare decisis is relied upon to ignore the rule. If the abandonment of the rule is so easily followed elsewhere as in the present case, then who knows but what by this time those cases upon which the opinion is based have been overruled.

In applying the lethal blow to the old telephone case,

crippling, if not deadly, effect is had upon the following cases and the varied interests affected: *Atchison, Topeka & S. F. Ry. Co. v. Public Utilities Com.,* 68 Colo. 92, 188 Pac. 747; *City of Pueblo v. Public Utilities Com.,* 68 Colo. 155, 187 Pac. 1026; *Golden Cycle M. & R. Co. v. Colorado Springs L. H. & P. Co.,* 68 Colo. 588, 192 Pac. 493; *City of Fort Collins v. Public. Utilities Com.,* 69 Colo. 554, 195 Pac. 1099; *Mountain States Tel. & Tel. Co. v. City and County of Denver,* 70 Colo. 377, 201 Pac. 1024; *Town of Holyoke v. Smith,* 75 Colo. 286, 226 Pac. 158; *City and County of Denver v. Henry,* 95 Colo. 582, 38 P. (2d) 895; *Spears v. Public Utilities Com.,* 100 Colo. 369, 67 P. (2d) 1029; *McKay v. Public Utilities Com.,* 104 Colo. 402, 91 P. (2d) 965; *Fishel v. City and County of Denver,* 106 Colo. 576, 108 P. (2d) 236; *Berman v. City and County of Denver,* 120 Colo. 218, 209 P. (2d) 754.

While I do not agree with the decision in the Berman case, supra, in that it denied the legislative body of the City and County of Denver any right whatever to fix utility rates, I did agree, and no one questioned the holding in that case, that the power to regulate utility rates had been conferred upon Denver, the majority believing that it was exclusive to the people of Denver, contrary to my view that it could be exercised by either the city council or the people. In the present opinion it is stated, "We are not called upon either to be governed by it or to overrule it." It is overruled by the majority opinion, which says that the regulation of rates of a telephone utility is of statewide concern, and regulation thereof no longer rests either with the people of Denver or its city council. Aside from the general topic of this dissenting opinion, I digress long enough to say that I still believe the great majority of all the judges of this court, since 1919, have adhered to, and believed in, the ruling that this power was delegated to Denver, either to its people or the city council, and in my opinion, the later amendments to the Constitution and all of the adjudicated cases hold that it is a legislative function and

within the city council's power to act, all of which can be overturned by the people if they so determine. It makes little difference in principle whether a franchise is involved or whether a utility is operating by sufferance when it comes to the right of the people, directly or through their "tophand," the city council, to regulate the rates thereof. It is to be remembered that the supplying of a utility, even by a private corporation, is the performance of an assumed public duty, and the property and means so used, is charged with a public trust. When the people of Denver by their charter, which was affirmed by the people of the state, expressed their intention to regulate the rates of a utility within its borders, it must be said to be a declaration of public policy in that regard.

Let us examine the position of the Public Utilities Commission (to which I will hereinafter refer as the Commission) herein. In the instant case it first acted, according to the argument of its counsel, with doubtful authority and then sought declaratory judgment as to its jurisdiction. On page 7 of its reply brief, counsel for the Commission say that it waited for the council of Denver to act, as a matter of *comity*. If it could not assert jurisdiction over the rates and services of a utility within the home-rule city of Denver, as it has always asserted, then the principle of comity would not apply. It was only a polite gesture in recognition of anticipated assumption of the jurisdiction in an area prohibited by the very terms of the act under which the Commission was created. It is stated on page 8 of its reply brief, "The Commission is not before this Court asking this Court to perform a legislative function." It is further contended that it believes as a matter of law, the new metropolitan rates and charges for the metropolitan service *offered* to subscribers in the City and County of Denver are, in fact, not matters local and municipal to Denver, but are of concern to the state, and in the next breath it is asserted that it is not insisted that this court overrule the

old telephone case decision. It is clearly the position of the Commission *that the metropolitan area supersedes and controls the municipal area.* The thing over which it is conceded that the Commission never had, or has tried, to exercise, jurisdiction of rates and charges for local service in Denver, has disappeared. It would thus seem that either the utility or the Commission can waive the magic wand over the people of Denver and their right to a local service disappears. The Commission's counsel say that in 1919, the date of the old telephone case decision, no metropolitan service was in existence. It is strange how the area was then served, because surely the area was supplied with telephones.

It is further stated that the telephone company no longer makes available a rate or charge for local service. Is this an avoidance of a public duty? The Commission further contends that what was in 1919 two distinct and separate services for which there were two distinct and separate charges, one regulated by Denver and the other by the Commission, *is today only one service with one flat minimum monthly charge.* That being true, the right to a local service has disappeared and the Commission, through this means, usurps the right of the people of Denver to exercise their power of regulation. In other words, because there is an outside area, Denver is now swallowed and forgotten by the plan for that area, *except as to extra pay from Denver subscribers.* By employment of the word "service" the Commission can decree a control.

After all of this supporting argument by the Commission as to a new service plan, its counsel then say, "As a matter of fact, to the Commission it is the institution of the new rate plan that is the determining factor in this proceeding." Thereby, the Commission says in effect, "Give us control of the Denver rates and services, because it is now called something else." The Commission says that if this court should determine that the Commission has exclusive jurisdiction over the Denver met-

ropolitan exchange rates, that would not divest Denver of its exclusive jurisdiction over the rates for a local Denver telephone service. If that is true, then it should be determined in this new rate-service plan how much of it is chargeable to Denver and how much to the metropolitan area. Denver has exclusive jurisdiction over something, the present majority opinion to the contrary notwithstanding.

Because of the usurpation of jurisdiction, is Denver relegated to the position of having to institute court proceedings to preserve its right to demand that there be a local rate for Denver? This seems to be the attitude of the Commission as shown by the following in its reply brief: "Denver and Sarpy insist that, if the Commission is adjudged to have exclusive jurisdiction of the *metropolitan rate,* that will divest Denver of its jurisdiction over the *local Denver rate.* That does not follow at all. The answer to this contention seems plain enough to the Commission. That is, that Denver, in the exercise of its exclusive jurisdiction over the rates for a local Denver service, determined by the Court in the 1919 Telephone case, may have the right to demand that the Telephone Company make such a rate for a strictly local Denver service again available to subscribers in Denver. But that right, *which to date Denver has not sought to exercise,* cannot divest the Commission of its exclusive jurisdiction over a metropolitan telephone rate which is not local and municipal to Denver."

Sarpy contends that the rates can be co-operatively regulated by "The people of Denver acting through the initiative and the Commission acting pursuant to Statute," and further contends that the two bodies could agree upon a rate structure to apply uniformly in Denver and a selected area beyond Denver, and that by an initiated ordinance, the plan could be put in force within the city and an appropriate order of the Commission put it in force in the suburbs. To this, the Commission says it is impractical, and then states, "By recognizing that

the above remarks might be criticized as being an argument addressed to expediency, *with which this court can do nothing but suggest legislative action,* we maintain that such concurrent jurisdiction is not contemplated under the laws of this state * * *." I would like an answer as to how these rates were regulated prior to the ordinance of 1947.

I see no reason why, in face of the now dimming boundary lines of Denver so far as the people of the metropolitan area and Denver and the disadvantage to the telephone company involved over the present and desirable mechanical operations, there could not be co-operative regulation of this complex situation by the initiation of an ordinance as provided by section 280 of the charter, approving a combined rate on the theory of the best interests of the people so far as it might appear that a portion of the rate and service was applicable to Denver, and the Commission then to determine what portion of the new rate and service was applicable to the metropolitan area surrounding Denver. By this co-operation, the so-called new service and new rates would not do violence to the intended powers the people gave to home-rule cities, nor would it extend or diminish the jurisdiction the legislature prescribed for the Commission. This could be made to apply with equal force and effect to all other home-rule cities in the state, and the provisions of the Constitution, the legislative enactments and the decisions of this court would remain intact.

I still adhere to the belief that the city council of Denver, in its legislative capacity, has full power within the boundaries of the city, to regulate utility rates and can do so after hearings and investigations, and that the power is not exclusive to the people. The people may exercise it if they desire to, and, in fact, would have the power to overturn any ordinance enacted by the council; however, under the Berman case, supra, that power rests alone with the people. The ordinance of

1947, here involved, is contrary to that decision and is now, by the majority opinion herein, wholly without any force or effect. In the briefs now before us, the right of Denver to question its own ordinance has been raised. Ordinarily, such argument is persuasive; however, the instant case relieves Denver of that questioned position. As I recall, Denver has always vigorously maintained the right of the council to act in these matters and did so with reference to the so-called Tramway ordinance of 1948, which precipitated the question determined in the Berman case, supra. The ordinance here involved was passed in 1947, long prior to the decision in the Berman case in June of 1949. It seems to be the present position of Denver and Sarpy that in face of the Berman case decision, the ordinance of 1947 is an abortive attempt on the part of the council to fix utility rates and regulations and is therefore void, which leaves in full force and effect the 1921 ordinance which was duly adopted by the people in accordance with charter section 280. It is my contention that the people of Denver have the power to, and should, favor adopting a co-operative ordinance as herein suggested or amend the charter, and it is not within the province of this court to do either.

First the opinion itself. The opinion is grounded upon four false premises, namely: 1. That the concern of Denver citizens about the rates of a monopolistic utility, which is permitted the privilege of using the streets and alleys of the city, is not local in its nature, but of *statewide* importance; 2. that because of the *demand* and use of services in areas outside the city, it no longer becomes a·matter of local or municipal concern; 3. by not adhering to the rule of stare decisis, this court has in effect usurped the voice of the people of the State of Colorado, and more particularly those of the City and County of Denver, and thwarted the plain constitutional direction as to the regulation of utility rates and validated the act of the state legislature in creating the public utilities

commission and restoring that power in the Commission, which years ago was given exclusively to the citizens of Denver as a home-rule city; 4. that "confusion, chaos and injustice have followed the wake of the former decision of thirty-three years ago."

If the decision in the old telephone case, in holding that under the charter and constitutional approval thereof, the city was vested with the power to regulate the rates of public utilities within its border, was wrong and "without support in the law," then the present opinion, holding that the regulation of the rates of the telephone company was never a matter of local or municipal concern, would appear to be right. However, the old telephone case, during all of the thirty-three years in which it has been upheld and approved time and again by this court, including the majority of the court as then constituted and as constituted during that thirty-three-year period, has become embedded in not only the majority of the judicial minds, but also a part of the law of the state and is entitled to preservation under the long established rule of stare decisis. It cannot logically be said that the old telephone case, supra, is a doubtful decision, neither can it be said that it is a recent decision. The rule is frequently ignored for valid reasons, namely, doubtful, recent decisions which have not become embedded in the jurisprudence of the jurisdiction. It is not now made doubtful because the majority of the court as now constituted, differs with the majority of the judges that have constituted this court over the period of thirty-three years. Even Mr. Justice Burke to whom reference is made in the majority opinion as expressing some existing doubts at the time he concurred in the old telephone case, said within a year after that decision, "It having been finally determined that The Public Utilities Commission is without jurisdiction to fix rates in Home Rule cities it is impossible that that body should acquire any such jurisdiction because such cities proceed illegally in the discharge of

that duty, or fail to act at all." *City of Pueblo v. Public Utilities Commission,* 68 Colo. 155, 187 Pac. 1026.

It is inferred in the majority opinion that Mr. Justice Burke was doubtful about his position in the old telephone case; nevertheless, he concurred in an opinion on this very same question wherein it is said, "After eighteen years the law so established should not be disturbed by a contrary judicial decision." *Spears v. Public Utilities Commission,* 100 Colo. 369, 67 P. (2d) 1029.

Concurring in the old telephone case, Mr. Justice Burke stated that he was lead to his conclusion by the overwhelming force of the decision in the case of *Home Telephone & Telegraph Co. v. City of Los Angeles,* 211 U.S. 265, that the opinion "supersedes all previous state and Federal decisions in conflict with it, and, in view of its positive statement that it is now too late to *ask* for a reconsideration of the proposition, it can not be presumed that the highest court of the land will hereafter otherwise decide. It is absolutely binding upon this court." And further stated, "If the people have granted this power to these Home Rule cities * * * It may be that the plan will not work out to the satisfaction of the people of the state. If so, it is within their province to *amend or repeal* it whenever they see fit. 'On their own heads, in their own hands, the sin and the saving lies.' " (Italics supplied.)

Contrary to the statement in the majority opinion that "confusion, chaos and injustice," have followed in the wake of our former decision, and that a "proper protection of the public interest, as well as the need for more just consideration of the interest of the telephone company, requires that our former decision be overruled," it is to be noted that the telephone company is not here now, nor in any recent years, has been, before the courts directly claiming that the rates imposed by the 1921 Denver ordinance were confiscatory; moreover, it is evident by the very pleadings in this case that the telephone company has engaged in a rapid and continued expan-

sion of the company's activities in Denver and throughout the state. It is conceivable that our present opinion could do more mischief to the people generally than it would do good for the utility. Overruling the old telephone case is not *required* to prevent further injustice, as sometimes permits departure from an old decision. "It is almost as important that the law be settled permanently as that it should be settled correctly."

Finally, the decisions of this court should prevail as the law of the case instead of the opinions of individual judges to the contrary, more especially when the identical question between the same parties has been before this court on at least eleven occasions over the years and the old telephone case was followed without deviation in principle or reason.

It is my opinion that what may be termed a property right, or at least, a public trust, is here involved. At least, the citizens of Denver, since the adoption of their charter in 1904, have had the right to believe it was within their power to control the activities of utilities within the city as affecting their property. No one can deny that as a municipal function the city of Denver has control over the streets and alleys of the city. The people have the power to say who or what can use or occupy the streets, and the power to refuse such occupancy at all, when such occupancy is for private purposes or gain. The Public Utilities Commission, or any other legislative commission, cannot interfere with such control and it is absurd to say that the people of Denver have the power to grant privileges to persons or utilities without being able to say upon what terms and conditions the privilege is to be exercised. It is just as absurd to say that an outside commission has the power to tell the people of Denver what they must accept for such privilege. The two matters are so closely related that a division of control should not be permitted. When this right is retained and reserved to the people, it is a pro-

tection against monopolistic tendencies that a utility might impose in an unreasonable manner.

In conclusion on this phase of the case and the majority opinion, I must say that since 1903, beginning with the case of *People ex rel. v. Sours,* 31 Colo. 369, 74 Pac. 167, our supreme court reports are replete with attacks seeking to nullify the power of the people to manage their own business. That, prior to 1902, the date of the adoption of Article XX, the legislature had the power to make a charter for Denver which would include the regulation of utility rates, has never been questioned. By Article XX, this court immediately said in the case of *City and County of Denver v. Hallett,* 34 Colo. 393, 83 Pac. 1066, that, "It was intended to confer not only the powers specially mentioned, but to bestow upon the people of Denver every power possessed by the legislature in the making of a charter for Denver."

Under this grant of power the people of Denver adopted its charter providing for the regulation of utility rates by the people, and in 1912, the people of the state of Colorado adopted what is known as the home-rule amendment wherein the charter of Denver and all of its provisions was ratified in the following language, "All provisions of the charter of the City and County of Denver * * * are hereby ratified, confirmed and validated as of their date." In the case of *People ex rel. v. Perkins,* 56 Colo. 17, 137 Pac. 55, our court said that the above quoted section of the home-rule amendment "may not be questioned." By the force of the language in the above quoted section of the home-rule amendment, section 280 of the Denver charter providing for the regulation of utility rates is carried along and its constitutionality "may not be questioned." Argument has been made, and a dissenting opinion written in the Berman case, supra, to which I subscribed, holding that section 280 of the charter is in violation of the due process clause of the state and federal Constitutions; however, the United States Supreme Court refused to entertain this

very question because no federal question was involved. I now believe due process is not denied, but is amply afforded by the courts. If the people of Denver did an awkward thing in the manner of providing for the regulation of utility rates in their charter, and failed to indicate how such regulation could be had in fairness to all interests involved, then it is for the people to change, and not for this court to, in effect, invade the province of the people. It must always be borne in mind that the people of the state have the exclusive right to place power and its exercise wherever they choose. They made a choice in the adoption of Article XX, and that was to take the original power vested in the legislature to make a charter for Denver, and give that power exclusively to the people of Denver. I doubt that the overwhelming weight of authority, as stated in the majority opinion, deals with this exact question. In most of the other states there is a reserve power in the constitution or it is extended to the legislative branch in the making of home-rule charters subject to such provisions. Summed up, the people of the state of Colorado said to the people of Denver, "You have all of the power that the legislature ever had to make your charter, you have made it, and we now approve it." This was the final and binding expression of the people.

It is interesting to note that ever since the adoption of Article XX of the State Constitution, the people, the legislature and the courts have recognized that the regulation of rates of utilities in home-rule cities rested with the people, and that is emphatically demonstrated by the legislative act of 1913 creating the public utilities commission, and especially section 16 of chapter 137, '35 C.S.A., where the legislature recognized that there was a place or places within the territorial boundaries of the state where the Public Utilities Commission would have no jurisdiction; and, further, in section 57, in making provisions for the enforcement of the act, the legislature again recognized that the Commission was not to have

the sole and exclusive regulation of utility rates in the entire state when it said, "the enforcement of which is not specifically vested in some other officer or tribunal."

The question of the jurisdiction of the Commission again arises in the following constitutional prohibition against its jurisdiction in certain matters, "The general assembly shall not delegate to any special commission * * * any power to make, supervise or interfere with any municipal improvement, money, *property*, or effects, whether held in trust or otherwise." Article V, section 35, Constitution. (Italics supplied.) In its true sense, the proprietorship of Denver streets is closely akin to property. The streets are dedicated to the use of the public, for public uses. It is the governmental function to guard that use. No franchise for the use of the streets for any private gain can be given by the city in its governmental capacity. That is reserved exclusively to a vote of the people. When any utility occupies the streets for its purposes, it follows that it is allowed this privilege upon terms or considerations. When a special commission of the legislature assumes to control the terms and conditions of that privilege, it falls within the prohibition of the constitutional section last above quoted.

By the majority opinion herein, we are now faced with the anomalous position of the desires, needs and requirements of those outside the municipal boundary, in the so-called metropolitan area, controlling the power of the people within the municipal boundaries to regulate and control the affairs local and municipal. Stripped of all language of concealment, the theory or proposition advanced by the telephone company, and supported by the Commission, is that the now proffered regulation is something entirely new under the name of metropolitan-area service. It is contended by the telephone company that the city council has power, and so exercised it, in its ordinance of 1947 to regulate this service. It is not

to be overlooked or discounted that in this neatly-packaged service, you find a rate enforcement.

Followed to its logical conclusion, the result of this metropolitan-area idea could mean that because of the alleged convenience of those who have chosen to live outside of the municipal boundary, coupled with the desire of the utility to serve that convenience, the control of a utility within the municipality is secondary to the needs of the surrounding area. The entire matter is adroitly referred to as a metropolitan area, including Denver. It is a novel idea that any suburban area includes a municipality. Let it not be mistaken, the service talked about here as being new has always existed in the form of a flat monthly rental for interDenver telephones with an additional or long distance charge beyond its boundaries. That was, and still remains fair, because A, as a Denver subscriber paid for an occasional call, if any, outside the city limits; now, with an increased monthly rental, he is called upon to bear the burden of B, who was a frequent or constant user of the service beyond the city limits. In other words, the telephone company said to A, "Here is your flat, increased Denver rate, take it or leave it." If actually known, this is a service paid for by the many for the benefit of the few. If the telephone company could, for thirty-three years, figure and profit by a flat intraDenver rate, and could figure the reasonable charge for the long distance, it could still do so.

This same condition existed in a less degree in 1919, the year of the decision of the old telephone case, supra. The kind of need concerning service has not changed, only in degree. The greater the activities of the utility, the greater the need of the city's jurisdiction; however, regardless of the arguments, the increase in the demands for service does not repeal the plain, unmistakable provisions of the Constitution which approved jurisdiction of utility-rate control in Denver. Any voluntary burden added or any convenient service proposed in expanding

a telephone system necessarily includes increased use and occupation of the streets the telephone company has been privileged to use. This phase of the matter anchors the entire situation to the rock of "local concern." Tersely stated, what was originally long distance calls on the pay-as-you-use plan, is now combined in a flat monthly rate to the Denver subscriber whether he wants to use the same or not. This court should not be a party to relieving the telephone company of making the additional charge for an additional over-boundary service, and thereby divest the local community of its jurisdiction over the rates within the city limits. Simply because the Commission seeks to recast, so to speak, a long-distance rate which originates in Denver and crosses the municipal boundaries, that it can thereby take over all authority concerning the local rate. Granting that it might be desirable to have a more convenient system, still any change to that end must come by way of an amendment to the Constitution, and not through the Commission or the telephone company, aided by this court. So far as actual rates for service are concerned, the proposed new metropolitan-area service changes nothing in fact but the exchange rates. The fact that it would be more convenient for the telephone company to handle the present situation as is proposed, does not change what was a *local* intra-Denver service into a matter of metropolitan or *statewide concern.* A strictly city user should not be charged a higher rate simply because his neighbor exercises free service beyond the city limits; neither should he pay a higher monthly rate for his local service simply because of the expanding requirements of the telephone company to serve people beyond the municipal boundary. The issue here, and as affected by the majority opinion, is the *organic law,* and not the convenience of the telephone company. I again say that there is an inseparable connection between rates and the grant of the right to occupy streets.

Perhaps needlessly, I have indulged in some discus-

.sion of the merits of this long-time controversy. Now a brief observation as to what may obtain in the wake of the present court decision. Does it, in effect, say to the people of Colorado, "You have no business voting on this question in November 1952"? In my opinion, it is an influential intrusion upon the right of the electorate to exercise its constitutionally reserved power. We may well take notice that a constitutional amendment transferring the regulation of utility rates from the people to the Public Utilities Commission in all home-rule cities was, by our last legislature, submitted to the vote of the people in the November 1952 election. If the present opinion in any way influences the people in that regard, it is, in my opinion, a usurpation of a legislative function. What would be the dilemma if our "bosses," the people, by their vote defeated the amendment? It would be tantamount to saying to this court, "We will attend to our business, you attend to yours."

I am not to be understood by this dissenting opinion as saying that a change in the present method is not desirable, but I do say emphatically that such a change must conform to all well-established principles of law and be achieved by the people speaking directly or through their legislature and not by the courts.

Article XX of the Constitution, the home-rule amendment thereto, and the charter of the City and County of Denver are offsprings of a common parentage, that of our original Constitution. What was then and there provided cannot be interfered with or nullified by the courts or the legislature or any of its creatures.

The author of the majority opinion herein says that the "intracity business conducted by the Mountain States Telephone and Telegraph Company is not a matter of local and municipal concern to the City and County of Denver, or any other home-rule city, it does not .necessarily follow that the services of all public utilities functioning in whole or in *substantial part* within a municipality must thus be classified." (Italics supplied.)

This is a distinction when applied to other utilities that may find it convenient to carry on a part of their operations beyond the city limits. The majority opinion further propounds the question to be determined in the following language, "Shall we now hold that the lawful regulation of the business and rates of the Mountain States Telephone and Telegraph Company within the limits of the City and County of Denver is a matter of general concern to inhabitants of the state outside. as well as inside the city limits * * *." I fail to see in what way it is the consern of anyone outside the city limits of Denver as to what rate or rates I may pay for my Denver telephone service. And, further, using the wording of the opinion, I fail to see any *impact* on the people of .the surrounding territory or any other part of the state caused by the matter of whether I pay three dollars or five dollars per month for my Denver exchange service, or whether that rate is fixed by the people, through whose suffrage the telephone company operates, or whether it is fixed by the Commission.

The telephone company insists that the 1947 ordinance is valid because the charter restriction, upheld in *Berman v. City and County of Denver, supra,* prohibited the city council from regulating charges, does not apply to "service." It strikes me that in principle there is no difference, because the alleged "new service" carries a change in rates. Under the Berman case, supra, and now by the majority opinion in this case, the ordinance is invalid. Therefore, we now have the spectacle of the council in the 1947 ordinance determining service plus rates for an area beyond the city limits and beyond the scope of the council's jurisdiction. That being so, it follows that the Commission, in not taking independent action of its own and conducting hearings relative to the strictly applicable Denver rate included in this over-all increase, simply adopted the service and rates established by an invalid ordinance. The council never having the power· to establish either the service or the rate

as the majority opinion holds, an illegal rate has been collected from the Denver patrons since 1947.

The record discloses that the Commission stood by and waited until Denver had acted through its council and then promptly, as it says, with Denver's consent, approved and adopted the new rates. Can the Commission superimpose itself into this picture in face of steadfastly contending for years that it had no jurisdiction? When and why the change of face? What would it have done if Denver had refused to pass the ordinance? What rate would the Commission actually fix, and how?

The majority opinion seemingly is based on the proposition that the whole scheme of things as ordained by the people, is unworkable and a forced hardship and inconvenience on the utility. This in face of the fact that the company has apparently prospered and expanded without a complaint of confiscatory conditions. This new plan of "metropolitan-area service" was voluntarily conceived by the utility and not by the people clamoring for a different service; and, of course, it is *not designed to provide less revenue*. If our home-rule situation, as created by the people, is such, that when a utility breathes unfavorable upon it, it falls apart, then the majority of the voters of this state who are within the confines of home-rule cities, are helpless and impotent to arrange as to how their affairs may be governed.

It seems to be the position of the Commission that by virtue of its act in approving the new rate or service structure covering the metropolitan area that it acquired jurisdiction over all telephone service within the city limits of Denver. Its jurisdiction is defined in the legislative act creating it, and that jurisdiction is, by the act, clearly subject to areas reserved to other agencies. That the legislature recognized home-rule cities as such areas, is beyond doubt. That the telephone company is a utility operating within the municipal limits of Denver is unquestioned when it is so operating in Denver by the sufferance of the people, then the charges for its service

is within the control of the people of Denver, acting directly or, at least, through its legislative body. If it can be said that the plan of regulation inaugurated by the people and reserved to them in their Denver charter is impracticable and unworkable, the utility is not deprived of due process because whatever the process might be, nothing but a reasonable rate could be established, and as against an unreasonable rate, with or without a hearing, the utility is protected by our Constitution, as well as the Constitution of the United States, and the protection of the courts cannot be deprived them. In a recent decision of this court, *Bennett v. Mountain States Tel. & Tel. Co.,* 121 Colo. 325, 215 P. (2d) 714, Mr. Justice Jackson, speaking for the court on the subject of rate regulation, approved the following quotation, "The power to fix, subject to constitutional limits, the charges of such a business as the furnishing to the public of telephone service, is among the powers of government, is legislative in its character, continuing in its nature, and capable of being vested in a municipal corporation." Denver has such invested power. If the present majority opinion is an approval of the plan here inaugurated, then there is no limit to further extended areas that may be tacked on to the Denver telephones at an additional cost. The limit may be the distance for which wire is available.

I think the present decision will lead to countless controversies not only in the field affected in this case, but in all other fields of the law because the stabilizing effect of established precedent is now obsolete, and uncertainty hovers over every trial court and lawyers will be unable to guess what the law might be tomorrow. Moreover, all previous decisions of this court may, by a differently constituted court, be uprooted as manifestly erroneous.

In fairness to my associates on the court and to the parties who have filed petitions for rehearing, let it be said that this dissenting opinion is filed long after the

announcement of the majority opinion herein, however, as of that date, and my associates did not have the benefit, if any, of my views when they concurred in and announced the majority opinion.

I think the judgment of the trial court which followed the long line of our decisions should be affirmed.