656 P.2d 1313 (1983)
CITY OF CRAIG, Colorado, Plaintiff-Appellant,
v.
The PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO, and Edythe S. Miller, Daniel E. Muse and L. Duane Woodard as the Members thereof, and the Denver and Rio Grande Western Railroad Company, Inc., Defendants-Appellees.
No. 81SA172.
Supreme Court of Colorado, En Banc.
January 17, 1983.
Stockton, Lewis & Beckwith, James A. Beckwith, Denver, Worth F. Shrimpton, Craig, for City of Craig.
J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Eugene C. Cavaliere, Asst. Atty. Gen., Denver, for Public Utilities Commission State of Colo.
John S. Walker, Denver, for Denver and Rio Grande Western R. Co.
DUBOFSKY, Justice.
The City of Craig (Craig) appeals from an order of the Moffat County district court affirming the closure of two railroad crossings by the Public Utilities Commission (PUC). Because the actions of the PUC were an appropriate exercise of the PUC's police power under the Constitution and *1314 statutes, we affirm the judgment of the district court.
The defendant Denver and Rio Grande Western Railroad Company, Inc. (Rio Grande) operates a railroad line within the City of Craig. The railroad tracks run along one side of an industrial area in the southern portion of the city known as the Craig Yard. Prior to the initiation of the proceedings before the PUC which gave rise to this litigation, access to the Craig Yard was gained by crossings at Breeze and Russell Streets.[1] As a result of industrial development in the area of the Craig Yard, Moffat County applied to the PUC for authority to open outside the city limits an additional crossing into that area (the First Street crossing) in August, 1979. In December of the same year, the Rio Grande filed an application with the PUC to close the Breeze and Russell street crossings due to safety considerations. The two applications were consolidated for hearing. The hearing officer recommended that both applications be granted, with the closure of the Breeze and Russell Street crossings effective upon the opening of the First Street crossing. The PUC adopted the recommended decision on September 23, 1980, and Craig then sought judicial review of the closure decision in Moffat County district court. The district court affirmed the PUC order.[2] Craig makes two jurisdictional arguments challenging the PUC's closure decision. First, Craig contends that the decision to close railroad crossings is one which is reserved to home-rule cities such as itself by Article XX, Sec. 6 of the Colorado Constitution[3] and by sections 31-15-501 and 31-15-706, C.R.S.1973 (1978 Repl.Vol. 12),[4] *1315 and therefore the PUC was without jurisdiction to make the closure decision. Second, Craig argues that the closure of the Breeze and Russell Street crossings amounts to a taking of City property on which the crossings were situated. Because the PUC has no power of eminent domain, Craig claims that the PUC lacked jurisdiction to close the crossings.

I.
The district court held that Craig's authority under sections 31-15-501 and 31-15-706 is limited to a determination of the points of crossing which Craig deems to be in its best interests, subject to the overriding authority vested in the PUC by section 40-4-106, C.R.S.1973[5] to regulate for public convenience, necessity and safety. The reasoning of the district court is sound. Reading sections 31-15-501 and -706 together with section 40-4-106(3), it is clear that section 40-4-106(3) contains the only explicit statutory authorization of power to abolish a railroad crossing. This power is vested in the PUC.
The issue presented by this case is similar to that in Colorado and Southern Railway v. District Court, 177 Colo. 162, 493 P.2d 657 (1972), which involved two statutory provisions *1316 regarding the establishment of railroad crossings. One statutethe predecessor to section 40-4-106detailed the powers and duties of the PUC in regulating acquisition of land for crossings. The other addressed the right of one public utility to condemn the land of another. This Court read the two statutes together to settle the issue of whether the railroad could go directly to court in an eminent domain proceeding to condemn land for a railroad crossing, and held that PUC proceedings to determine the particular point of crossing are a condition precedent to the cause of action in eminent domain. Similarly, as the district court recognized in ruling on this case, sections 31-15-501 and -706 and section 40-4-106(3) can be reconciled[6] to authorize local control of the establishment of crossings, limited by the PUC's exercise of the police power to regulate and abolish crossings in the interest of public safety.
Craig's argument that the power to order the closure of railroad crossings is reserved to the city by Article XX, Sec. 6 of the Colorado Constitution is not persuasive. Article XX, Sec. 6 grants the right of self-government in local matters to home-rule cities and provides that conflicting statutes shall be superseded by city charters and ordinances on purely local matters. Century Electric Service v. Stone, 193 Colo. 181, 564 P.2d 953 (1977); see note 3, supra. While the provisions of the Craig City Charter concerning railroad tracks[7] could be interpreted as in conflict with section 40-4-106, the regulation of public utilities in the interest of public safety and convenience is a matter of state-wide concern. See Century Electric Service v. Stone, supra (legitimate state interest in licensing electricians overrides local licensing provisions); PUC v. Mountain States Telephone, 125 Colo. 167, 243 P.2d 397 (1952) (the regulation of the telephone company's local rates and services is a matter of state-wide concern within the jurisdiction of the PUC). The addition of Article XXV to the Colorado Constitution[8] in 1954 granted the PUC the authority to regulate privately owned public utilities within home-rule cities. City and County of Denver v. PUC, 181 Colo. 38, 507 P.2d 871 (1973). State statutes often vest exclusive regulatory power over railroads in public service commissions. E.g., Hemphill v. Wabash R.R. Co., 209 F.2d 768 (7th Cir. 1954); Penn Central Co. v. Dept. of Public Works, 356 Mass. 478, 253 N.E.2d 339 (1969); Chicago v. Chicago Great Western Railroad, 348 Ill. 193, 180 N.E. 835 (1932). See also Rhyne, Law of Local Government Operations § 22.5 (1980). The state's interest in making railroad safety a matter of state-wide concern is two-fold: it ensures a uniformity in railroad safety conditions, and it makes possible the regulation and supervision of those conditions by an agency possessing experience and expertise in such matters. While Craig also has a legitimate interest in the safety of its railroad crossings, *1317 the existence of a demonstrable local interest does not endow a home-rule city with preemptive authority. Century Electric Service v. Stone, supra. The concomitant state interest in regulation is predominant. Id.
Thus, neither sections 31-15-501 and -706 nor Article XX, Sec. 6 of the Colorado Constitution allows Craig to override the decision of the PUC abolishing the Breeze and Russell Street railroad crossings in the interest of public safety.

II.
Craig's argument that the PUC lacked jurisdiction to make the closure decision because the closure constitutes an exercise of the power of eminent domaina power which the PUC does not possessis answered by our decision in Colorado and Southern Railway, supra. PUC proceedings to determine the advisability of closing a railroad crossing for safety reasons are not an adjudication of property rights in the crossing but a condition precedent to such an adjudication. As the hearing officer concluded in his order recommending to the PUC that the crossings be closed, "In the event a closure is determined proper by this Commission, property rights of the City and the Denver and Rio Grande Western are issues to be determined at another time and in another forum." The PUC's valid exercise of its statutory authority over existing crossings simply leaves to the affected parties the resolution of the issue of the property interest in the crossings. The district court's order recognized some of the potential solutions: "The City may have the right to evict the railroad;[9] the railroad may have the right to exercise its statutory power of eminent domain through the courts to establish a right of way;[10] or the railroad and the City may negotiate some agreement for the Railroad's use of City property; but the Commission has and may exercise control under the police power to regulate and close the Breeze and Russell Street crossings."
The order of the district court is affirmed.
NOTES
[1] For approximately 50 years prior to 1964, the Rio Grande or its predecessor in interest held a franchise from Craig for the operation of the railroad within Craig. When that franchise expired in 1964, no extension, permit or license was negotiated. As is noted below (see note 9, infra), the precise nature of the Rio Grande's property interest is not relevant or at issue in proceedings before the PUC to determine whether railroad crossings should be closed in the interest of public safety.
[2] The district court also held that Moffat County was not an indispensable party to the appeal, inasmuch as the County's application for a First Street crossing had been approved without protest or appeal by any party, and as the County's interests were not affected by the closure decision. The Rio Grande initially filed notice of cross-appeal of the denial of its motion to dismiss for Craig's failure to join Moffat County as a party to the appeal of the closure decision. The Rio Grande abandoned the issue in this Court, however.
[3] Article XX, Sec. 6 provides in pertinent part:

"It is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the full right of self-government in both local and municipal matters and the enumeration herein of certain powers shall not be construed to deny such cities and towns, and to the people thereof, any right or power essential or proper to the full exercise of such right.
The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except insofar as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters."
[4] Sections 31-15-501 and 31-15-706 provide in pertinent part:

XX-XX-XXX. "(1) The governing bodies of municipalities have the following powers to regulate businesses:
. . . . .
(f)(I) To license, regulate, and control the laying of railroad tracks, to provide for and change the location, grade, and crossing of any railroad, and to control, regulate, and prohibit the use of steam engines and locomotives propelled by steam power within the corporate limits;
(II) To require railroad companies to fence their respective railroads or any portion of the same and to construct cattle guards at crossings of streets and public roads and keep the same in repair within the limits of the municipality;
(III) To require railroad companies to keep flagmen at railroad crossings of streets and to provide protection against injury to persons and property in the use of such railroads;
(IV) To compel such railroads to raise or lower their railroad tracks to conform to any grade which may at any time be established by such municipality and, when such tracks run lengthwise of any street, alley, or highway, to keep their tracks on a level with the street surface so that such tracks may be crossed at any place on such street, alley, or highway;
(V) To compel and require railroad companies to make, keep open, and keep in repair ditches, drains, sewers, and culverts along and under their railroad tracks so that filthy or stagnant pools of water cannot stand on their grounds or rights-of-way and so that the natural drainage of adjacent property shall not be impeded; ...."
XX-XX-XXX. "Railroad track. (1) The governing body of each municipality has the power to grant the use of, or the right to lay down, any railroad track in any street of the municipality to any steam or street railroad company operating its cars, by any kind of mechanical motive power, only upon the written consent of the owners of the land representing more than one-half of the frontage of the street or so much thereof as is sought to be used for railroad purposes. No franchise shall be granted on that part of any street upon which any other company is operating cars without the written consent of a majority of the frontage owners in every block abutting the track already down upon said street.
(2) The governing body of each municipality has the power to extend, by condemnation or otherwise, any street, alley, or highway over or across or to construct any sewer under or through any railroad track, right-of-way, or land of any railroad company within the corporate limits, but where no compensation is made to such railroad company, the municipality shall restore such railroad track, right-of-way, or land to its former state or in a sufficient manner not to have impaired its usefulness."
[5] Section 40-4-106 provides in pertinent part:

"(1) The commission shall have power, after hearing on its own motion or upon complaint, to make general or special orders, rules, or regulations or otherwise to require each public utility to maintain and operate its lines, plant, system, equipment, electrical wires, apparatus, tracks, and premises in such manner as to promote and safeguard the health and safety of its employees, passengers, customers, subscribers, and the public and to require the performance of any other act which the health or safety of its employees, passengers, customers, subscribers, or the public may demand.
(2)(a) The commission has the power to determine, order, and prescribe, in accordance with the plans and specifications to be approved by it, the just and reasonable manner including the particular point of crossing at which the tracks or other facilities of any public utility may be constructed across the tracks or other facilities of any other public utility at grade, or above or below grade, or at the same or different levels, or at which the tracks or other facilities of any railroad corporation may be constructed across the tracks or other facilities of any other railroad corporation or across any public highway at grade, or above or below grade, or at which any public highway may be constructed across the tracks or other facilities of any railroad corporation at grade, or above or below grade and to determine, order, and prescribe the terms and conditions of installation and operation, maintenance, and protection of all such crossings which may be constructed including the watchman thereat or the installation and regulation of lights, block, interlocking, or other system of signaling, safety appliance devices, or such other means or instrumentalities as may to the commission appear reasonable and necessary to the end, intent, and purpose that accidents may be prevented and the safety of the public promoted.
. . . . .
(3) The commission also has power upon its own motion or upon complaint and after hearing, of which all the parties in interest including the owners of adjacent property shall have due notice, to order any crossing constructed at grade or at the same or different levels, to be relocated, altered, or abolished, according to plans and specifications to be approved and upon just and reasonable terms and conditions to be prescribed by the commission, and to prescribe the terms upon which the separation should be made and the proportion in which the expense of the alteration or abolition of the crossing or the separation of the grade should be divided between the railroad corporations affected or between the corporation and the state, county, municipality, or public authority in interest."
[6] Craig concedes that the provisions of Title 31 and Title 40 do not conflict.
[7] Article VIII, § 7 of the Craig City Charter provides: "The Council ... may by ordinance require any railroad company to elevate or lower any of its tracks running over, along, or across any street or alley of the City, or to take such other measures for the protection of the public, as in the opinion of the Council the public safety or convenience may require."
[8] Colo. Const. Art. XXV:

"Public Utilities. In addition to the powers now vested in the General Assembly of the State of Colorado, all power to regulate the facilities, service and rates and charges therefor, including facilities and service and rates and charges therefor within home rule cities and home rule towns, of every corporation, individual, or association of individuals, wheresoever situate or operating within the State of Colorado, whether within or without a home rule city or home rule town, as a public utility, as presently or as may hereafter be defined as a public utility by the laws of the State of Colorado, is hereby vested in such agency of the State of Colorado as the General Assembly shall by law designate.
Until such time as the General Assembly may otherwise designate, said authority shall be vested in the Public Utilities Commission of the State of Colorado; provided however, nothing herein shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises; and provided, further, that nothing herein shall be construed to apply to municipally owned utilities."
[9] Craig argues strenuously that the expiration of the Rio Grande's franchise to operate the railroad within Craig makes the Rio Grande a mere tenant at sufferance, devoid of legal authority to continue such operations. Whatever the merits of this argument for subsequent proceedings, the Rio Grande's property interest is not relevant to the PUC's exercise of the police power.
[10] Conversely, Craig may have a cause of action in inverse condemnation against the Rio Grande.