The DENVER AND RIO GRANDE WESTERN RAILROAD COMPANY, a Delaware corporation; the Atchison, Topeka and Santa Fe Railway Company, a Delaware corporation, Plaintiffs-Appellees,

and

The Burlington Northern Railroad Company, a Delaware corporation, Involuntary Plaintiff-Appellee,

v.

The CITY AND COUNTY OF DENVER, a municipal corporation, Defendant-Appellant.

No. 83SA242.

Supreme Court of Colorado, En Banc.

Nov. 29, 1983.

Kathleen M. Snead, Denver, for The Denver and Rio Grande Western R. Co., plaintiff-appellee.

Grant, McHendrie, Haines & Crouse, P.C., Peter J. Crouse, Patrick A. Grant, Denver, for The Atchison, Topeka and Santa Fe R. Co., plaintiff-appellee.

No appearance for The Burlington Northern R. Co., involuntary plaintiff-appellee.

Max P. Zall, City Atty., Thomas A. Gilliam, Robert M. Kelly, John L. Stoffel, Jr., Asst. City Attys., Denver, for the City and County of Denver, defendant-appellant.

ERICKSON, Chief Justice.

This appeal was taken after the district court granted a writ of prohibition. The court found that the City and County of Denver (Denver) exceeded its jurisdiction by initiating proceedings under Ordinance 362 and publishing notice requiring The Denver and Rio Grande Western Railroad Company, The Atchison, Topeka and Santa Fe Railway Company, and The Burlington Northern Railroad Company (Railroads) to pay for construction of the West Eighth Avenue Viaduct (Viaduct). We affirm.

I.

The present Viaduct in Denver was constructed by the Colorado State Highway Department under the provisions of an

agreement dated November 9, 1936.[1] The Viaduct has deteriorated to the extent that it has been necessary for Denver to reduce the allowable weight limits of vehicles on the Viaduct. The continuing deterioration of the Viaduct may require Denver to close it for safety purposes within the next year.

In the early 1980's, Denver started appropriating funds to pay for the engineering, including design work and detailed plans and specifications, for a replacement for the existing Viaduct. Detailed plans and specifications for rebuilding the Viaduct were prepared and completed by the spring of 1982. These plans and specifications provide for a wider Viaduct on essentially the same centerline as the existing Viaduct, with minor variations. They also provide for new supporting columns, one of which would be located in the middle of a Rio Grande storehouse dock. Upon completion of the plans and specifications, the Mayor and the Manager of Public Works (Manager) decided to recommend to the Denver City Council that Denver proceed with the demolition of the existing Viaduct and the construction of a replacement Viaduct under the newly finished plans and specifications pursuant to Denver City Charter § A2.3–6 (1955).

In order to initiate the process under Denver City Charter § A2.3–6, the Mayor and the Manager presented Council Bill 407 to the City Council. Council Bill 407 authorized the Manager to secure estimates for the cost of constructing the Viaduct and directed him to adopt whichever plan for construction he decided was the most satisfactory. Upon the adoption of a plan, the Manager was directed to recommend a bill for an ordinance requiring the construction of the Viaduct and apportioning the cost as he deemed proper and reasonable among the Railroads. Before recommending the bill, the Manager was to give notice of the adoption of a plan and set a date for hearing all objections to the plan. The City Council passed Council Bill 407 as Ordinance Number 362 on July 6, 1982.

In accordance with the requirements of the ordinance, on December 30, 1982, the Manager published notice that he had adopted a plan for construction of the Viaduct, which he proposed to recommend to the council; had estimated the cost to construct it; and had prepared an apportionment of the total cost among the Railroads. The notice set a hearing for January 27, 1983, at which time the Manager would entertain any objections to the plan and other relevant matters including, but not limited to, the appropriate apportionment of the cost among the Railroads. On January 27, 1983, representatives of the Manager and of the Railroads agreed to postpone the hearing until February 24, 1983.

On February 23, 1983, the Railroads filed suit in Denver district court. The complaint sought relief under C.R.C.P. 106(a)(4); declaratory relief under the Uniform Declaratory Judgments Act, sections 13–51–101, et seq., C.R.S.1973, and C.R.C.P. 57; and injunctive relief. The Railroads asserted that the Department of Public Works and Denver did not have jurisdiction to hold the hearing scheduled in the notice of December 30, 1982. The Railroads contended that the Public Utilities Commission (PUC), and not Denver, has exclusive jurisdiction over the construction of and apportionment of costs for grade separation structures under Colo. Const. art. XXV and section 40–4–106(3), C.R.S.1973.[2]

On February 23, 1983, subsequent to the filing of the complaint and a motion for stay of proceedings, the Railroads and Denver agreed to postpone further proceedings under the notice of December 30, 1982, until such time as the district court could rule on the Rule 106 motion for a stay of further

1. The agreement was between the Highway Department, the City of Denver, The Colorado and Southern Railway Company (now merged into The Burlington Northern Railroad Company), The Denver & Rio Grande Western Railroad Company, and The Atchison, Topeka and Santa Fe Railway Company.

2. The General Assembly in 1983 amended section 40–4–106, C.R.S.1973, and added what is now 3(b). Colo.Sess.Laws 1983, ch. 453, 40–4–106(3) at 1558–60.

proceedings. On March 8, 1983, the parties appeared before the district court on the Railroads' motion for the issuance of a rule to show cause and for a stay of further proceedings. Denver contended that it was premature for the district court to assume jurisdiction under Rule 106 because the Department of Public Works and the Denver City Council had not taken final action. Denver asserted further that a writ of prohibition was inappropriate because the Railroads claimed that Denver Charter § A2.3–6 was unconstitutional and a constitutional challenge cannot stand as a basis for relief under Rule 106. The district court ruled under Rule 106 that Denver, acting by and through the Manager, had exceeded its jurisdiction by issuing the notice of December 30, 1982 pursuant to Ordinance 362 and that the Railroads were entitled to a writ of prohibition.[3]

The district court heard arguments and entered an order in the nature of prohibition on May 3, 1983. Thereafter, a motion for new trial was denied and notice of appeal was filed on May 31, 1983. On June 15, 1983, we entered an order expediting the briefing schedule and oral argument of the case.

## II.

Denver claims that the order prohibiting it from proceeding under the notice of December 30, 1982, was inappropriate because the Railroads failed to exhaust their administrative remedies.

We agree that relief under Rule 106 was inappropriate insofar as the Manager may have made changes in his plan for the Viaduct or in his apportionment of costs. However, the basic issue here is the Railroads' challenge to Denver's authority over the construction of and apportionment of costs for a viaduct over railroad tracks. The Railroads' statutory and constitutional claims are the appropriate subjects for a declaratory judgment action. *Bonacci, Jr. v. Aurora,* 642 P.2d 4 (Colo.1982).

Although the district court here ruled under Rule 106, its ruling was in the nature of a declaratory judgment. The Railroads' complaint sought declaratory and injunctive relief on the same basis as Rule 106 relief. Therefore, rather than returning this case to the district court for a ruling on the statutory and constitutional questions under Rule 57 and the Uniform Declaratory Judgment Act, we shall treat the rulings entered as declaratory and injunctive. Although relief under Rule 106 on the facts of this case may have been premature, the district court had jurisdiction to declare that Denver was proceeding without authority and to enjoin Denver from proceeding to require the Railroads to pay for construction of the Viaduct.

## III.

The thrust of Denver's argument is that Denver Charter § A2.3–6 is a proper exercise of the implied police powers granted under *Colo. Const.* art. XX, § 6 over the construction and apportionment of costs for viaducts within a home-rule municipality. Since the construction and apportionment of costs for viaducts is a matter of exclusive local and municipal concern, Denver claims that section 40–4–106, C.R.S.1973 (1982 Supp. & Colo.Sess.Laws 1983, ch. 453 at 1558–60), which grants jurisdiction to the PUC, is superseded and controlled by Denver Charter § A2.3–6. We reject Denver's argument.

The Home Rule Amendment, *Colo. Const.* art. XX, recognizes three broad categories into which subjects may be classified in matters of: (1) exclusive local and municipal concern; (2) exclusive state-wide concern; and (3) mixed local and state-wide concern. *Woolverton v. City and County of Denver,* 146 Colo. 247, 361 P.2d 982 (1961).

In matters involving exclusive local and municipal concern, home-rule charter provisions and ordinances supersede conflicting state statutes. *DeLong v. Den-*

---

**3.** The parties stipulated prior to trial that the issues raised in the Rule 106 claim were ready for final determination on the record as made and the remaining issues and claims would be held in abeyance pending final determination on the Rule 106 issues.

ver, 195 Colo. 27, 576 P.2d 537 (1978); *Vela v. People,* 174 Colo. 465, 484 P.2d 1204 (1971); *see also Colo. Const.* art. XX, § 6, ¶ 1 (the people have the power to adopt charters which extend to all its local and municipal matters). In matters of exclusive state-wide concern, state statutes supersede home-rule charter provisions and ordinances. *Century Electric v. Stone,* 193 Colo. 181, 564 P.2d 953 (1977); *Pierce v. Denver,* 193 Colo. 347, 565 P.2d 1337 (1977). If, however, the matter is of mixed local and state-wide concern, it must be determined whether there is a conflict between the charter provisions or ordinances and the state statute. If, for example, there is no conflict, the charter provisions and state statute may coexist. *Greeley Police Union v. City Council,* 191 Colo. 419, 553 P.2d 790 (1976); *DeLong v. Denver, supra.* If, on the other hand, there is a conflict, the statute supersedes the home-rule charter provisions. *Century Electric v. Stone, supra; Denver v. Bossie,* 83 Colo. 329, 266 P. 214 (1928); *DuHamel v. People ex rel. Arvada,* 42 Colo.App. 491, 601 P.2d 639 (1979); *see generally* Klemme, *The Powers of Home Rule Cities in Colorado,* 36 U.Colo.L.Rev. 321 (1964). The pivotal inquiry is whether the construction of and apportionment of costs for the Viaduct located within the home-rule municipality of Denver is a matter of exclusive local and municipal concern, a matter of exclusive state-wide concern, or a matter of mixed local and state-wide concern, in which case, if there is a conflict, then section 40–4–106 must supersede Denver Charter § A2.3–6.

A.

■ We have not formulated a litmus test for determining whether a matter is of local, state-wide, or mixed concern; instead, we have weighed various factors on a case-by-case basis.[4]

■ Denver has a considerable interest in the construction of railroad-highway crossings within its municipal limits. The construction and apportionment of costs for the Viaduct directly bears upon Denver's efforts to formulate a local plan for effective traffic management. In our view, the construction of the Viaduct is unquestionably a matter of some local concern. We are, however, unable to agree with Denver's contention that the construction of and apportionment of costs for the Viaduct is a matter of exclusive local and municipal concern.

The construction and apportionment of costs for the Viaduct is also of paramount interest to people living outside Denver and is therefore a matter of mixed local and state-wide concern.[5] Denver's imposition of costs on the Railroads impacts directly upon the Railroads' ability to serve their customers beyond the home-rule municipality of Denver. The Railroads, in this case, serve other home-rule municipalities throughout the state. If these other home-rule municipalities determine that it is in their respective best interests to impose the costs of construction for viaducts on the railroads, the possible result is that the affected railroads may well decide to reduce service, or even, in some cases, to terminate service. Denver's decision to construct and apportion costs for the Viaduct may affect, in

---

4. For example, in *People ex rel. Public Utilities Commission v. Mountain States Telephone & Telegraph Co.,* 125 Colo. 167, 243 P.2d 397 (1952), we characterized a matter as state-wide because, in our view, the municipal ordinance would have a substantial impact on persons living outside the municipal limits. In *People v. Graham,* 107 Colo. 202, 110 P.2d 256 (1941), we found that matters are likely to be characterized as of state-wide concern where uniformity of regulation is desirable. In *City and County of Denver v. Sweet,* 138 Colo. 41, 49–50, 329 P.2d 441, 445 (1958), we held that: "Whether a particular business activity is a matter of municipal concern to a city under Article XX depends upon the inherent nature of

the activity and the impact or effect which it may have or may not have upon areas outside of the municipality." On the other hand, in *Dominguez v. City and County of Denver,* 147 Colo. 233, 363 P.2d 661 (1961), the fact that the subject matter which the municipal regulation sought to control was peculiar to heavily populated areas caused us to view the matter as local.

5. Our ruling is limited to this case where there is a conflict between the home-rule municipality's charter provision and the state statute, both of which purport to regulate a matter of mixed local and state-wide concern.

important and significant ways, people residing beyond the home-rule municipality of Denver and is thus a matter of state-wide concern. In addition, the state's interest in the regulation of railroad safety makes authority over the construction of and apportionment of costs for viaducts a matter of state-wide concern. State regulation would insure uniformity in railroad safety at these crossings and make possible supervision by an agency possessing experience and expertise in such matters. *City of Craig v. Public Utilities Commission,* 656 P.2d 1313 (Colo.1983).

■ The General Assembly has the sole power to enact general laws which formu-

late the state's public policy. *Denver v. Tihen,* 77 Colo. 212, 235 P. 777 (1925); *Keefe v. People,* 37 Colo. 317, 87 P. 791 (1906). An examination of the legislative history of section 40–4–106, C.R.S.1973 (1982 Supp. & Colo.Sess.Laws 1983, ch. 453 at 1558–60),[6] demonstrates conclusively that the General Assembly has, beginning with its enactment of the original version of section 40–4–106 in 1913, sought to make the matter of railroad safety at railroad-highway grade crossings a matter of state-wide concern subject to the regulatory control of the PUC.[7]

In *City of Craig, supra,* this court interpreted section 40–4–106 and addressed is-

---

**6.** Section 40–4–106(3), C.R.S.1973, provides in pertinent part:

"(3)(a) The commission also has power upon its own motion or upon complaint and after hearing, of which all the parties in interest including the owners of adjacent property shall have due notice, to order any crossing constructed at grade or at the same or different levels, to be relocated, altered, or abolished, according to plans and specifications to be approved and upon just and reasonable terms and conditions to be prescribed by the commission, and to prescribe the terms upon which the separation should be made and the proportion in which the expense of the alteration or abolition of the crossing or the separation of the grade should be divided between the railroad corporations affected or between the corporation and the state, county, municipality, or public authority in interest.

(b) Prior to January 1 of each year the commission shall take applications for grade separation construction projects and shall hold hearings, of which all parties in interest including the owners of affected property located within a one mile radius shall have due notice, to determine which projects shall be constructed and to allocate the expenses of construction between the railroad corporations affected and between the corporation and the state, county, municipality, or public authority in interest. Only those grade separation construction projects which meet minimum criteria warranting grade separations, as adopted by the public utilities commission giving consideration to the standards utilized by the Colorado highway commission, shall be authorized for construction prior to March 1 of each year pursuant to this paragraph (b). In its selection the commission shall consider traffic, safety, and geographic distribution.

(c)(I) In the allocation of expenses for each grade separation construction project pursuant to paragraph (b) of this subsection (3)

between the affected class I railroad corporations and the state, county, municipality, or public authority in interest, the commission shall give equal weight to the benefits, if any, which accrue from the grade separation project and the responsibility for the need, if any, for such project.

(II) In the allocation of the class I railroad corporations' share of expenses for a grade separation construction project pursuant to paragraphs (a) and (b) of this subsection (3), the commission shall consider the benefits, if any, which shall accrue between the class I railroad corporations affected.

(III) The commission shall allocate such expenses among all affected class I railroad corporations up to a total of five million dollars during the twelve months beginning July 1, 1983, and up to five million dollars per year for each succeeding year. Total allocations to each class I railroad shall not exceed one million two hundred fifty thousand dollars in any one year, or six million two hundred fifty thousand dollars in any five-year period. Nothing in this subparagraph (III) shall preclude any class I railroad corporations from voluntarily contributing more than its allotted share for grade separation construction in one year; and in such event, all amounts contributed by such railroad exceeding its allotted share in any year shall be credited to and shall serve to reduce any allocation for grade separation construction expenses to that railroad in subsequent years. Nothing in this subparagraph (III) shall be construed to authorize less than twenty-five million dollars to be assessed against all affected class I railroad corporations in any five-year period."

**7.** The General Assembly created the PUC in 1913 and vested the PUC with the authority to regulate the principal phases of the railroad business. In 1917, the General Assembly

sues strikingly similar to those raised in this case. In that case, defendant, The Denver and Rio Grande Western Railroad, operated a railroad line within the City of Craig, a home-rule city. The railroad filed an application with the PUC to close several street crossings because of safety considerations. The PUC, in effect, adopted a recommendation that the street crossings be closed. The district court affirmed the PUC order. On appeal, the City of Craig contended, in part, that the decision to close the railroad crossings was one which was reserved to home-rule cities under Article XX, section 6 of the Colorado Constitution and its city charter provision.[8] We rejected the city's claim, and held that the regulation of public utilities in the interest of public safety and convenience was a matter of state-wide concern. We stated:

"While Craig also has a legitimate interest in the safety of its railroad crossings, the existence of a demonstrable local interest does not endow a home-rule city with preemptive authority. *Century Electric Service v. Stone, supra.* The concomitant state interest in regulation is predominant."

*Id.* at 1316–7.

### B.

Since the construction of and apportionment of costs for viaducts within a home-rule municipality is a matter of mixed local and state-wide concern, we must determine whether Denver Charter § A2.3–6 conflicts with section 40–4–106, C.R.S.1973 (1982 Supp. & 1983 Colo.Sess.Laws, ch. 453 at 1558–60).

*Colo. Const.* art. XX, § 6 provides in pertinent part:

"The people of each city or town of this state, having a population of two thousand inhabitants as determined by the last preceding census taken under the authority of the United States, the state of Colorado or said city or town, are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to all its local and municipal matters.

"Such charter and the ordinances made pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith.

. . . .

"The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except insofar as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters."

---

amended the Public Utilities Act and provided the PUC with authority to control the abolition or erection of any and all highway-railroad crossings at grade or above grade or below grade, including the power to apportion among railroads, municipalities and other public authorities the costs of alteration, abolition, or separation of existing crossings. In 1965, the General Assembly amended the Public Utilities Act and added what is currently identified as section 40–4–106(2)(b). This provision created the State Highway Crossing Protection Fund to make monies available for improved protection at railroad-highway crossings and gave the PUC authority to approve new protection devices and to apportion costs among railroads, the State Highway Protection Fund, and the interested political subdivision of the state. Most recently, in 1983, the Act was amended to add what is now identified as section 40–4–106(3)(b) (Colo.Sess.Law 1983, ch. 453, 40–4–106(3) at 1558–60). Under this amendment,

the General Assembly has granted the PUC authority to prioritize grade separation projects and to apportion costs "between the railroad corporations affected and between the corporation and the state, county, municipality, or public authority in interest." The PUC is further authorized to apportion the expenses of these projects among all Class 1 railroad corporations up to a total of $5,000,000 a year.

8. Article 8, section 7 of the Craig City Charter provides:

"The Council . . . may by ordinance require any railroad company to elevate or lower any of its tracks running over, along, or across any street or alley of the City, or to take such other measures for the protection of the public, as in the opinion of Council the public safety or convenience may require."

The parallels between the provision at issue in *City of Craig* and the provision at issue in this case are striking.

Notwithstanding the Colorado Constitution's broad grant of power to home-rule cities, Denver is subject to state control in all matters of state-wide concern. *Keefe v. People,* 37 Colo. 317, 87 P. 791 (1906).

Denver, pursuant to the powers granted it under *Colo. Const.,* art. XX, § 6, adopted Denver Charter § A2.3–6 which provides that the Manager has the authority "to require railroad companies, at their own expense, to construct viaducts, bridges or tunnels, or parts of viaducts, bridges or tunnels, and their approaches over, along or under railroad tracks where the same cross or extend along public highways or streets." Under Denver Charter § A2.3–6, the Manager may require that railroads construct, at their own expense, viaducts over railroad tracks where the tracks cross public highways and streets. The Manager is authorized also to apportion the construction expenses equitably among the different companies owning the affected trackage.[9]

The General Assembly has, however, enacted section 40–4–106(3), C.R.S.1973 (1982 Supp. & Colo.Sess.Laws 1983, ch. 453 at 1558–60), which authorizes the PUC to order any crossing constructed at grade or at the same or different levels, to be "relocated, altered, or abolished ..." and to "prescribe the terms upon which the separation should be made and the proportion in which the expense of the alteration or abolition of the crossing or the separation of the grade should be divided between the railroad corporations affected or between the corporation and the state, county, municipality, or public authority in interest." [10]

■ Denver Charter § A2.3–6 confers upon the Manager the authority to regulate matters which are within the PUC's exclusive jurisdiction under section 40–4–106. We find no reasonable way to reconcile these competing jurisdictional grants and must therefore conclude that the Denver Charter § A2.3–6 conflicts with section 40–4–106.[11] We hold, accordingly, that the construction of and apportionment of costs for viaducts is a matter of mixed local and state-wide concern, and that because there is in this case a conflict between Denver Charter § A2.3–6 and section 40–4–106, section 40–4–106 must supersede Denver Charter § A2.3–6.

### C.

*Colo. Const.* art. XXV vests in the PUC "all power to regulate the facilities, service and rates and charges" of public utilities, within or without a home-rule municipality. An exemption from PUC jurisdiction provides that the authority granted the PUC under Article XXV shall not affect the "power of municipalities to exercise reasonable police and licensing powers.... "

Denver contends that the power to regulate the construction of and apportionment of costs for the Viaduct falls within the municipality's authority to exercise reasonable police power and is therefore exempted from the reach of Art. XXV. We disagree.

In *People ex rel. Public Utilities Commission v. Mountain States Telephone and Telegraph Co.,* 125 Colo. 167, 243 P.2d 397 (1952), we held that the PUC is the sole agency authorized to regulate the business and rates of the Mountain States Tele-

---

**9.** Denver, Colo., City Charter A2.3–6 provides: "Approaches, Over, Along or Under Railroad Tracks. Subject to approval by ordinance, to require railroad companies, at their own expense, to construct viaducts, bridges or tunnels, or parts of viaducts, bridges or tunnels, and their approaches over, along or under railroad tracks where the same cross or extend along public highways or streets. Whenever the Manager shall deem any such improvement necessary, the Manager shall recommend a Bill for an Ordinance requiring the construction of such improvements, the character and location of such proposed improvements to be therein described with suf-

ficient certainty and the estimated cost thereof to be stated; and where a viaduct or tunnel crosses or passes under the tracks of several railroad companies, the Manager shall have the power to apportion the cost thereof equitably among the different companies owning such tracks."

**10.** *See supra* note 6.

**11.** A conflict exists if the ordinance permits what the statute prohibits or vice versa. *Ray v. City and County of Denver,* 109 Colo. 74, 121 P.2d 886 (1942).

phone & Telegraph Company and that the regulation of the Company is not a "local or municipal" matter. In that case, we determined that it would be "grossly unreasonable to subject a telephone company to separate regulation by as many agencies as there are home-rule cities," and cited with approval from a dissenting opinion in *City and County of Denver v. Mountain States Telephone & Telegraph Co.,* 67 Colo. 225, 184 P. 604 (1919):

> " 'The contention that each city operating under the amendment may regulate public utilities operating within its borders, must apply to all alike. It follows that if it applies to telephones, it likewise applies to railroads. In case of these utilities one company may operate in all municipalities and throughout the state.
>
> " 'It also follows that one utility may be regulated by as many powers as there are cities of the specified class within the state, and by the commission as to all territory outside the cities.... The logical result of such a plan is confusion, chaos, and injustice.' "

125 Colo. at 177, 243 P.2d at 402.

The rationale in *People ex rel. Public Utilities Commission v. Mountain States Telephone and Telegraph Co., supra,* is equally applicable to this case. The construction of and apportionment of costs for viaducts is a matter of mixed local and state-wide concern and subject therefore to the preemptive jurisdiction of the PUC. If we were to allow home-rule municipalities to determine independently, under the auspices of the exemption provided for in Article XXV, how the costs of construction for viaducts crossing railroads should be apportioned among the interested parties, we would be sowing the seeds for a regulatory jungle. We hold, accordingly, that a municipality's authority to exercise reasonable police power does not encompass the right to regulate the construction of viaducts within a home-rule municipality because the con-

struction of and apportionment of costs for viaducts is a matter of mixed local and state-wide concern.

## IV.

Denver contends that *Colo. Const.* art. V, § 35 [12] prohibits the General Assembly from granting to the PUC the powers contained in section 40–4–106, C.R.S.1973 (1982 Supp. & Colo.Sess. Laws 1983, ch. 453 at 1558–60). We disagree.

The purpose of Art. V, § 35 is to proscribe the delegation of local government power to certain special commissions. *Town of Holyoke v. Smith,* 75 Colo. 286, 226 P. 158 (1924). The subjects to which the protection extends are such as properly fall with the domain of local self-government. *Town of Holyoke v. Smith, supra.* We have held, however, that the construction of and apportionment of costs for viaducts within a municipality is a matter of mixed local and state-wide concern. The state-wide concern in the regulation of public utilities and railroad-highway crossings is predominant.

Accordingly, we hold that the construction of and apportionment of costs for viaducts is not such a subject as was intended to fall within the domain of local self-government, and that therefore Art. V, § 35 does not prohibit the PUC's exercise of powers granted it under section 40–4–106, C.R.S.1973 (1982 Supp. & Colo.Sess.Laws 1983, ch. 453 at 1558–60).

We therefore affirm the judgment of the district court.

---

12. *Colo. Const.,* art. V, § 35 provides:

"The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever."