MOUNTAIN VIEW ELECTRIC ASSOCIATION, INC., a Colorado corporation, Petitioner-Appellee,

v.

The PUBLIC UTILITIES COMMISSION of the State of Colorado, Respondent-Appellant,

and

Carl H. Susemihl, Ellicott Flying Service, Inc., and Inezbelle Williams, Respondents-Appellees.

MOUNTAIN VIEW ELECTRIC ASSOCIATION, INC., a Colorado corporation, Petitioner-Appellee,

v.

The PUBLIC UTILITIES COMMISSION of the State of Colorado, Respondent-Appellee,

and

Carl H. Susemihl, Ellicott Flying Service, Inc., and Inezbelle Williams, Respondents-Appellants.

Nos. 82SA445, 82SA556.

Supreme Court of Colorado,
En Banc.

Aug. 20, 1984.

Rehearing Denied Sept. 10, 1984.

Robert T. James, Colorado Springs, for Mountain View Elec. Ass'n

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Eugene C. Cavaliere, First Asst. Atty. Gen., Denver, for Public Utilities Comm'n

Grant E. Miller, Woodland Park, for Carl H. Susemihl, Ellicott Flying Service, Inc., and Inezbelle Williams.

John S. Yodice and Ronald D. Golden, Bethesda, Md., for amicus curiae Aircraft Owners & Pilots Assoc.

DUBOFSKY, Justice.

This is an appeal from a Lincoln County District Court judgment which set aside an order of the Public Utilities Commission (PUC) as beyond the PUC's authority. The PUC had ordered Mountain View Electric Association, Inc. (Mountain View) to relocate or bury an electric transmission line because it posed a safety threat to a nearby airport. We reverse the district court's decision and remand with directions to reinstate the PUC's order.

The privately-owned Ellicott Airport has been used by the general aviation community since 1963. In the early 1970s, Mountain View, an electric utility serving rural areas in eastern Colorado, began to plan the construction of a transmission line north of the airport and to purchase rights-of-way for the line. Clemmy Williams, the owner of the land on which the airport is located, first heard of the proposed construction of the transmission line in 1974 when Mountain View inquired about a possible easement on his property. Williams met with an attorney for Mountain View who assured him that the transmission line would not constitute a hazard to the airport. Mountain View subsequently received reports from two consulting engineering firms and a Federal Aviation Administration licensed flight instructor that the proposed location of the line north of the airport would be safe.

On January 14, 1976, the PUC, on Mountain View's behalf, submitted the proposed location of the transmission line to the El Paso County Planning Commission for approval. Mountain View had requested the PUC to submit the proposed location to comply with the planning commission's requirements, but the PUC was unaware of the proximity of the line to the Ellicott Airport.[1] No one objected to the proposed

---

1. The planning commission directed Mountain View to request the PUC to submit the proposed location under section 30–28–110(1)(c), 12 C.R.S. (1973), which provided: "If the public way, ground, space, building, structure, or utility is one the authorization or financing of which does not, under the law governing the same, fall within the province of the board of county commissioners or other county officials or board, the submission to the [county planning] commission shall be by the body or offi-

location at a subsequent hearing before the planning commission, but airport representatives did not know about the hearing. The planning commission approved the location, and construction of the line began April 28, 1980. Mountain View completed the line August 2, 1980, including a segment located 2,875 feet from the north end of the airport's runway, and energized it on August 6, 1980.

Meanwhile, on July 18, 1980, representatives of the airport, Susemihl, Ellicott Flying Service, Inc., and Williams,[2] filed with the PUC a complaint against Mountain View alleging that the construction of a transmission line so close to the airport would endanger the lives of persons using the airport. At the hearing before a PUC examiner on October 22, 1980, the airport elicited testimony that the opinions previously obtained by Mountain View on the

safety of the line were insufficient and unreliable. The airport's evidence indicated that the transmission line posed a danger to any airplane taking off to the north whenever the temperature exceeded sixty degrees Fahrenheit.[3] The airport had notified its users that the airport would be closed when the temperature exceeded sixty degrees.

The PUC examiner concluded that the transmission line was a safety hazard and recommended that the PUC order Mountain View either to move the line no less than one-half mile further from the end of the runway or to bury the line at its present location. The PUC adopted its examiner's recommended decision as its own, and Mountain View appealed the PUC decision to the district court.[4]

The district court set aside the decision of the PUC, ruling that the order to relo-

---

cial having such jurisdiction, and the [county planning] commission's disapproval may be overruled by said body by a vote of not less than a majority of its entire membership or by said official." In 1983, the General Assembly added the following sentence to section 30–28–110(1)(c): "In the case of a utility owned by an entity other than a political subdivision, the submission to the commission shall be by the utility and shall not be by the public utilities commission; however, the commission's disapproval may be overruled by the public utilities commission by a vote of not less than a majority of its entire membership." Ch. 362, sec. 1, § 30–28–110(1)(c), 1983 Colo.Sess.Laws 1252.

2. Carl Susemihl is a flight instructor at the Ellicott Airport. Ellicott Flying Service, Inc. is the operator of the airport. Clemmy Williams, an original complainant, owned the land on which the airport is located. Williams died before the filing of the appeal, and his widow, Inezbelle Williams, has been substituted for him.

3. The PUC examiner's decision explained the effect of increasing altitude and temperature on airplane efficiency:

*"Private Pilots' Handbook of Aeronautical Knowledge,* was offered and admitted into evidence as Exhibit 21. At page 18 of this Exhibit, the following discussion of density altitude is set forth:

'... as altitude increases, the pressure is diminished by the weight of the column below. This decrease in pressure (increase in density altitude) has a pronounced effect on flight. *Effect of Altitude on Flight.* For ordinary flights, the most noticeable effect of a decrease in pressure (increase in density alti-

tude) due to an altitude increase becomes evident in take-offs, rates of climb, and landings. An airplane that requires 1,000 foot run for take-off at a sea level airport will require a run almost twice as long to take-off at Denver, Colo., which is approximately 5,000 feet above sea level. The purpose of the take-off run is to gain enough speed to get lift from the passage of air over the wings. If the air is thin, more speed is required to obtain enough lift for take-off hence, a longer ground run. It is also true that the engine is less efficient in thin air, and the thrust of the propeller is less effective. The rate of climb, too, is much slower at Denver, requiring a greater distance to gain altitude to clear any obstructions. In landing, the difference is not so noticeable except that the plane has greater ground speed when it touches the ground....'

. . . . .

Ellicott submitted Exhibit 22 which established official U.S. Weather Bureau temperatures, with consequent density altitude, for the Ellicott area for the period of time from July 18, through August 10, 1980. The lowest temperature Fahrenheit for said period of time was 80 degrees on August 4, 1980, with lowest density altitude being 9,100 feet."

4. Although the transmission line is located in El Paso County, Mountain View's principal place of business is in Lincoln County. Thus, the Lincoln County District Court has jurisdiction over the appeal. Section 40–6–115(5), 17 C.R.S. (1973).

cate or bury the transmission line was beyond the PUC's authority. The court concluded that the PUC does not have eminent domain power and the order amounted to a taking of Mountain View's property without just compensation. The court also decided that the PUC could not overrule a county planning commission's approval of the location of electric lines, that the statute under which the PUC operated is unconstitutionally vague, and that the complainants did not have standing to bring this action before the PUC. The PUC and the original complainants appeal.

The issue before us is whether the PUC has the authority to order the relocation or burial of a transmission line which constitutes a safety hazard. We hold that the PUC appropriately exercised its statutory police power and reverse the decision of the district court.

## I.

The Public Utilities Commission has broad authority to regulate public utilities in this state, Colo. Const. art. XXV; *City of Montrose v. Public Utilities Commission*, 629 P.2d 619 (Colo.1981), including authority to regulate public utilities in the interest of public safety. Section 40–3–101(2), 17 C.R.S. (1973) sets out a public utility's duty to maintain safe facilities.[5] The PUC may take notice of any violation of this duty by complaint made on the PUC's own motion or by any person. § 40–6–108(1)(a), 17 C.R.S. (1973).[6] Section 40–4–101(1), 17 C.R.S. (1983 Supp.) specifically authorizes the PUC to order changes in facilities for safety purposes:

Whenever the commission, after a hearing upon its own motion or upon complaint, finds that the … practices, equipment, facilities, or service of any public utility or the methods of … transmission … employed by it are … unsafe …, the commission shall determine the … safe … practices, equipment, facilities, service, or methods to be observed … and shall fix the same by its order, rule, or regulation.

In addition, section 40–4–106(1), 17 C.R.S. (1973) states:

The commission shall have power, after hearing on its own motion or upon complaint, to make general or special orders, rules, or regulations or otherwise to require each public utility to maintain and operate its … electrical wires … in such manner as to promote and safeguard the health and safety of … the public and to require the performance of any other act which the health or safety of … the public may demand.

These statutes authorize the PUC's order that Mountain View bury or relocate its transmission line.

Mountain View argues, however, that its right to use the airspace over its easement is superior to any right of the public to fly through the airspace, and that the PUC's order to relocate or bury a portion of the line is a taking of Mountain View's property. The district court agreed and ruled that the PUC order is a taking without just compensation in violation of article II, section 15, of the Colorado Constitution.[7]

We addressed this issue in *City of Craig v. Public Utilities Commission*, 656 P.2d 1313 (Colo.1983), decided after the district court ruled in the present case. In *City of Craig*, the city appealed a decision affirming the PUC's closure of two railroad crossings for safety purposes. The city

---

**5.** Section 40–3–101(2) provides: "Every public utility shall furnish, provide, and maintain such service, instrumentalities, equipment, and facilities as shall promote the safety, health, comfort, and convenience of its patrons, employees, and the public, and as shall in all respects be adequate, efficient, just, and reasonable."

**6.** Section 40–6–108(1)(a) provides in part: "Complaint may be made by the commission on its own motion or by any … person … by petition or complaint in writing, setting forth

any act or thing done or omitted to be done by any public utility, including any rule, regulation, or charge heretofore established or fixed by or for any public utility, in violation, or claimed to be in violation, of any provision of law or of any order or rule of the commission."

**7.** Article II, section 15, provides in part: "Private property shall not be taken or damaged, for public or private use, without just compensation."

argued that the closure of the crossings was a taking of city property and that the PUC has no power of eminent domain. We stated:

> PUC proceedings to determine the advisability of closing a railroad crossing for safety reasons are not an adjudication of property rights in the crossing but a condition precedent to such an adjudication.... The PUC's valid exercise of its statutory authority over existing crossings simply leaves to the affected parties the resolution of the issue of the property interest in the crossings.

*Id.* at 1317. Similarly, PUC proceedings to determine remedies for an unsafe transmission line are not an adjudication of property rights in the airspace. The PUC's conclusion that a safety hazard exists and the determination of an appropriate remedy are valid exercises of its constitutional and statutory police power. Exercise of the police power is independent of an adjudication of property rights, an authority not given to the PUC. Because there is no requirement that the PUC await an adjudication of property rights before reacting to unsafe conditions, we reverse the district court's ruling that PUC action requires a prior judicial determination of property rights.

## II.

■ The district court also ruled that the PUC had no authority to issue its order and thereby overrule the El Paso County Planning Commission's approval of the line's location. The court said that the PUC's authority to regulate public utilities in the interest of safety must be construed to give effect to the planning commission's authority to approve the location of utility lines under section 30–28–110(1)(a), 12 C.R.S. (1973), which provides in part:

> Whenever any county planning commission ... has adopted a master plan of the county or any part thereof, ... no public utility, whether publicly or privately owned, shall be constructed or authorized in the unincorporated territory of the county until and unless the proposed location and extent thereof has been sub-

mitted to and approved by such county or regional planning commission.

According to the district court, the PUC has no authority over the location of lines approved by the planning commission unless the location violates PUC regulations promulgated before the location is approved. We do not read section 30–28–110(1)(a) as a limitation on the authority of the PUC. The section provides a method for a county to oversee its master plan; it does not override the PUC's statutory duty and authority to oversee the safety of utility operations throughout the state.

A similar issue was before the court in *City of Craig*, 656 P.2d 1313. The city argued that the authority to close railroad crossings was reserved to municipalities by statutes giving municipalities the power to control the location of railroad crossings. We reconciled the statutory provisions with the statutory authority of the PUC to close crossings for safety reasons by concluding that the statutes "authorize local control of the establishment of crossings limited by the PUC's exercise of the police power to regulate and abolish crossings in the interest of public safety." *Id.* at 1316.

This case is analogous to *City of Craig*. Section 30–28–110 authorizes county control of the location of utility lines, limited by the PUC's exercise of its police power to regulate lines in the interest of public safety. County planning commissions do not have the authority or expertise to evaluate the safety of utility operations, and the approval by the commission of the location of an electrical line should not preclude a PUC determination relative to public safety. The safety of a location may vary with time, and the PUC has been given the duty to oversee safety, independent of a previous approval of location.

■ One difference between this case and *City of Craig* is that here the PUC originally submitted the proposed location of the line to the planning commission. This factor does not alter our analysis. Mountain View, without disclosing the existence of a potential safety hazard to the Ellicott Airport, requested the PUC to sub-

mit the proposed location in order to comply with statutory requirements.[8] In any event, the PUC is not precluded from exercising its duty to ensure public safety by participating in the prior approval of a location. Public safety is of overriding concern.

■ A related issue stems from the court's ruling that the PUC's authority over locations approved by the planning commission is limited to remedying violations of PUC safety regulations promulgated prior to planning commission approval. This is incorrect. Section 40–4–106(1), 17 C.R.S. (1973), states that the commission has power to perform any act necessary for public safety by "general or special orders, rules, or regulations." The PUC is not limited to rulemaking in its duty to oversee safety; section 40–4–106(1) authorizes it to issue special orders in individual cases. Such orders, on a case by case basis, are appropriate because questions of public safety are often, as here, fact specific.

### III.

■ The district court ruled that the original complainants, Susemihl, Ellicott Flying Service, Inc., and Williams, did not have standing to challenge the transmission line location before the PUC as they had an adequate legal remedy, citing *Norby v. City of Boulder,* 195 Colo. 231, 577 P.2d 277 (1978). *Norby* discusses the process of appealing a decision of a county planning commission. The complainants in this action were not appealing the planning commission's decision; they were bringing an independent action before the PUC alleging that Mountain View's transmission line constituted an unlawful safety hazard. Section 40–6–108(1)(a), 17 C.R.S. (1973) gives the complainants the right to file such a complaint with the PUC:

> Complaint may be made ... by any ... person ... by petition or complaint in writing, setting forth any act or thing done or omitted to be done by any public utility ... in violation, or claimed to be in violation, of any provision of law or of any order or rule of the commission.

### IV.

The district court also set aside the PUC's order on the basis that section 40–4–106(1), 17 C.R.S. (1973) is void for vagueness. Section 40–4–106(1) provides:

> The commission shall have power, after hearing on its own motion or upon complaint, to make general or special orders, rules, or regulations or otherwise to require each public utility to maintain and operate its lines, plant, system, equipment, electrical wires, apparatus, tracks, and premises in such manner as to promote and safeguard the health and safety of its employees, passengers, customers, subscribers, and the public and to require the performance of any other act which the health or safety of its employees, passengers, customers, subscribers, or the public may demand.

Although the district court discussed the vagueness doctrine, it characterized the statute as a delegation from the General Assembly to the PUC to promote public safety. We believe this issue is better framed as whether the statute unlawfully delegates legislative authority to the PUC. *See Loup-Miller Construction Co. v. City and County of Denver,* 676 P.2d 1170 (Colo.1984) (allegations that statutes directed to administrative agencies are unconstitutionally vague raise the issue of unlawful delegation).

■ The legislature may delegate power to an administrative agency if there are sufficient statutory and administrative standards and safeguards to protect against uncontrolled exercise of discretionary power. *Loup-Miller Construction Co. v. City and County of Denver,* 676 P.2d at 1177; *Cottrell v. City and County of Denver,* 636 P.2d 703, 709 (Colo.1981). "The guiding consideration is whether these constraints are sufficient to insure that administrative action will be rational and consistent in the first instance and that subsequent judicial review of that action is available and will be effective." 636 P.2d at 709.

---

**8.** See n. 1, *supra.*

We conclude that the standards and safeguards in section 40–4–106(1) are adequate. Although the statute contains a broad grant of power to the PUC to promote public safety, it is no broader than necessary to fulfill the intent of the General Assembly. Here the power to be exercised is a police power, and it is impracticable to fix rigid standards without destroying the flexibility necessary for administrative officials to carry out the wishes of the legislature. *Elizondo v. State*, 194 Colo. 113, 570 P.2d 518 (1977). Neither the General Assembly nor the PUC can predict all potential safety hazards and prohibit them by statute or regulation.

Case by case decisions of the PUC are subject to a number of procedural safeguards, including the right to present evidence, examine and cross-examine witnesses and a written decision. *See* § 40–6–109, 17 C.R.S. (1973). There is also an adequate procedure for judicial review of a fact-specific PUC safety determination. *See* §§ 40–6–115 to 40–6–117, 17 C.R.S. (1973 & 1983 Supp.).

We reverse the judgment of the district court and remand the case with directions to reinstate the PUC's order.